J-S33001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MATTHEW DAVID HENKEL | : | |
| | : | |
| Appellant | : | |
| | : | No. 1641 WDA 2014 |

Appeal from the Judgment of Sentence September 8, 2014
in the Court of Common Pleas of Allegheny County Criminal Division
at No(s): CP-02-CR-0014480-2013

BEFORE: GANTMAN, P.J., OLSON, J., and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED MAY 05, 2016**

Appellant, Matthew David Henkel, appeals from the judgment of sentence entered in the Allegheny County Court of Common Pleas following a jury trial and convictions for criminal attempt-criminal homicide[1] and aggravated assault.[2] Appellant contends his sentence is illegal under ***Alleyne v. United States***, 133 S. Ct. 2151 (2013) and that the evidence was insufficient to convict him of attempted homicide because he acted in self-defense. We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 901(a).

[2] 18 Pa.C.S. § 2702(a)(2). The charge of recklessly endangering another person was withdrawn. ***See*** Order, 9/8/14.

A jury trial was held on June 17-19, 2014. We summarize the relevant testimony as follows. Police Officer Matthew James Toney testified, *inter alia*, as follows: On August 15, 2013, he was dispatched for a shooting. N.T., 6/17/2014, at 51-52. "Officer Alex was in route."[3] *Id.* at 52. 911 advised that there were shots fired and a male was shot in the street, "just outside the address originally dispatched, 509 Elizabeth." *Id.* He received "information that the shooter might be in a residence." *Id.* at 54. Officer Alex, Officer Mike Lewis, and Officer Toney went to the location of the original call from 509 Elizabeth Street. *Id.* Appellant was in the residence. *Id.* at 55. Officer Toney observed a firearm in a holster on a table inside the residence at 509 Elizabeth Street. *Id.* at 56-57. Appellant was taken into custody. *Id.* at 56.

Jamal Dixon, the victim, testified to the following. He was walking his dog near his house at 1 Elizabeth Street. N.T., 6/18/14, at 119-120. He saw a neighborhood "young guy" in his teens from Elizabeth Street.[4] *Id.* at 123. Dixon asked Morgan about "an event that happened a week before, with him hitting [Dixon's] car with a basketball." *Id.* at 125. The basketball hit the passenger side window of his car. *Id.* at 126. Morgan "denied he was ever playing with the basketball that day over there, and that it was another kid; and then another gentleman[, identified as Appellant,] walked

---

[3] Our review of the record did not reveal the officer's first name.

[4] This individual was identified as Jacob Morgan. *Id.* at 393.

up." ***Id.*** at 127-28. The conversation with Morgan "started to become an argument." ***Id.*** at 128. Dixon characterized his discussion with Appellant as an argument. ***Id.*** at 130. Appellant told Dixon to leave his half-brother alone. ***Id.*** Dixon brought the dog back to his house so his fiancée could watch the dog while he cleaned the yard of the dog's waste. ***Id.*** at 134. He testified that he cleaned up with a Giant Eagle bag. ***Id.*** Appellant and Morgan went back into their house. ***Id.*** at 135. Appellant, Morgan, and another child came back outside and Appellant asked to see the mark on Dixon's car. ***Id.*** at 136. Morgan said someone else did it. ***Id.*** There was yelling during the argument. ***Id.*** Dixon walked away and Appellant was cursing. ***Id.*** Dixon asked Appellant to walk down the street because of the cursing in front of Dixon's house. ***Id.*** at 137. Appellant said he did not have to go and that "Pittsburgh passed the Stand Your Ground Law." ***Id.***

Dixon testified:

> So then, after that, you know, I started walking back down towards him, like, you know, just, go ahead down the street. So he pushes me; and after he pushes me, I said, if you, you know, put your hands on me, again, I'm going to hit you in the head with this bag of dog shit; and that's when he just pulled the gun out.
>
> [The Commonwealth]: . . . Now, did you push him at all?
>
> A: No, never.
>
> Q: Did you hit him?
>
> A: No, never.

Q: Did you make any threat beyond threatening to hit him with the bag of dog poop?

A: No, never.

Q: Did you bring your dog into the street at any point?

A: Never.

Q: Did your fiancée bring your dog into the street at any point?

A: Never.

\* \* \*

Q: [A]t the time that he pushed you, were you guys close together?

A: Yes.

Q: Arguing?

A: Yes.

\* \* \*

Q: So what did you do?

A: Like, I just, like, turned myself to, like, protect myself. . . .

\* \* \*

Q: . . . Did you just put your hands up a moment ago on the stand?

A: Yes.

Q: [D]id you put your hands up like that at that time?

A: Yes. . . .

*Id.* at 138-43. Dixon was shot in the arm and the left hip. *Id.* at 144-45. As he tried to crawl away, he heard more shots. *Id.* at 146. After the paramedics came and he was in the ambulance, "they said, we need to hurry up. There is another one in the chest, and there is another one in the pelvic area." *Id.* at 149-50.

Kaelin Bubonovich testified as follows. She was Dixon's fiancée. *Id.* at 200-01. Dixon did not attempt to hit Appellant or make any threats "other than threatening to hit him with the bag of dog poop." *Id*. at 212. She had custody of the dog prior to the shooting. *Id.* After Dixon threatened to hit Appellant with the bag, Appellant pushed Dixon. *Id.* at 213. Appellant "took a step back; and the next thing I know there was a gun and shots being fired." *Id.* She

> heard two to three shots. I saw [Dixon] hit the ground.
> He yelled, I've been shot; and at this point I was already
> calling 911, and yelling, please stop, please stop; and he
> hit the ground; and he tried to, like, get cover underneath
> our car . . . . He was trying to get cover on the car; and
> [Appellant] just kept firing. Then I finally heard the gun,
> click, click, click; and I knew that it was out of bullets . . . .

*Id.* at 214.

Daniel W. Best testified that he lives at 3 Elizabeth Street. *Id.* at 241-42. On the date of the incident, he heard two gunshots and he "started to go to the front of the house, to go outside to see what was happening . . . and right before I got near the front door, [he] heard two or three more

shots." *Id.* at 244-45. He heard at least two more shots the second time but "it could have been three or four" shots. *Id.* at 245.

Brian Kocher testified to the following. He lives at 2 Elizabeth Street. *Id.* at 250. He heard three shots fired and then he saw Dixon "start crawling. Then [he] heard at least four more shots . . . ." *Id.* at 253. He did not see a dog at any time during this incident. *Id.* at 254. Danielle Kocher, Brian's wife, testified. *Id.* at 260, 263. She initially heard two shots and then "like, four more shots." *Id.* at 265. She did not see the dog in the street when she looked out of her window. *Id.* at 272.

Mary Morgan,[5] another neighbor, testified on behalf of Appellant that Dixon "struck [Appellant] somehow, and the force knocked him over . . . ." *Id.* at 312. When Appellant got up, "he had a gun." *Id.* There was no gap in between the shots being fired. *Id.* at 320. On cross-examination, she testified, *inter alia*, as follows:

> [The Commonwealth]: And you testified today that Jamal Dixon hit [Appellant], struck him physically?
>
> A: He made contact with him; but I don't know exactly how. He made contact enough that there was a shove.
>
> Q: Did you not testify on direct that Jamal Dixon—
>
> A: I thought that he punched him, yes, with his right, yes.
>
> Q: —and knocked him over? Those were your words, correct?

---

[5] Mary was Jacob's Mother. *Id.* at 299.

A: He knocked him back, is what I said.  He knocked [Appellant] back enough that he didn't completely fall on the ground.  [Appellant] caught himself.

*Id.* at 335.

Jacob Morgan testified that he and Appellant went with Dixon to look at the damage to Dixon's car.  *Id.* at 358.  Dixon admitted there was nothing wrong with his car "and he said, it's all good." *Id.* at 59.  He said that Dixon "stated that he had to stick up for himself because of the Travon[6] Martin case." *Id.* at 359-60.  Appellant responded that "the Stand Your Ground Law was put into Pittsburgh a couple years back." *Id.* at 360. Appellant started to walk away and "Dixon became upset." *Id.*  Dixon "said I'm going to hit you with this dog shit; and he ran towards" Appellant. *Id.* He testified that Dixon hit Appellant on "[t]he side of his face.  The side of his head area." *Id.* at 364.  Appellant "stumbled backwards.  He almost fell over; and he barely caught his balance with his hand as he fell back." *Id.* Appellant "as he came up, he came up with the gun." *Id.* at 365.  There was a "very slight difference between the shots." *Id.* at 367.

Appellant testified on his own behalf.  He "observed Jacob Morgan up the street in a verbal confrontation with somebody." *Id.* at 398.  He testified, *inter alia*, as follows:

[Defense Counsel]:  Tell us what happened.

---

[6] We note the proper spelling of "Trayvon" contains a "y" omitted in the transcript.  However, we reproduce the spelling of the name as it appears in the transcript.

- 7 -

A: As I stated, I was walking up Anthony Street. On the same side of the street as Jacob Morgan. Mr. Dixon was on the opposing side of the street. I walked up Anthony Street. I passed Elizabeth Street; and that's when I came in contact with Jacob Morgan.

At that time Jacob Morgan said, this guy's trying to beat me up. He's accusing me of hitting his car with a basketball. I advised Jacob Morgan at that time—I asked Jacob Morgan, did you do it. He said, no. I said, just walk away. Then just walk away.

*   *   *

Q: And then what happened?

A: Mr. Dixon then said—asked who I was. I said I was Jacob Morgan's brother; and we were walking away. We were—I said, sir, we're walking away. . . .

Q: Did Mr. Dixon have his dog with him at that time?

A: Yes, he did.

Q: Would you give us a description of the dog?

A: Just a big pit bull.

*   *   *

Q: Why did you say you were his brother? You're really not his brother, are you?

A: No, I'm not.

Q: Why did you say you were his brother?

A: Because we were just friends.

Q: What happened?

A: Mr. Dixon then turned his tirade against myself.

Q: Would you describe what happened?

A: He was threatening me, saying that, . . . he mentioned he had been in the Army, in Iraq, and he had guns in his house. He wasn't afraid to go get them. He made threats about trading a zip to have people down from the Hill District to take care of us.

At that time I said, Mr. Dixon, we have no problems with you. We would just like to walk away. We're going to turn around and walk the opposing direction of you so you do not have to see us on the street anymore.

Q: What was his response, if anything?

A: He said, I don't care which way you go, I'll keep following you. . . .

\* \* \*

Q: Were any profanities being used?

A: By Mr. Dixon, yes.

Q: Did you use any profanity?

A: No, I did not.

\* \* \*

Q: What happened next?

A: . . . Mr. Dixon stood on [the] corner as we continued to walk away yelling threats about getting guns, and shooting us, and harming us.

Q: Did you take any action by calling the police or anything like that?

A: No. I—I walked away. I thought that walking away was the best way to handle the situation.

\* \* \*

Q: What happened to stop—or did it stop?

A: It eventually stopped when Mr. Dixon left the scene. . . .

*Id.* at 402, 404-08.

Appellant took Jacob Morgan home. *Id.* at 410.

Q: Why did you then escort Mr. Morgan to his house?

A: Because he asked me to.

Q: Would you tell us what happened?

A: After he asked me to walk him home, I said that I would walk him home. . . . We made a left onto Elizabeth Street; and I saw Mr. Dixon, and I didn't know Mr. Dixon's name at the time, but I saw Mr. Dixon then in front of where I now know to be his home, with his girlfriend.

\* \* \*

Q: Then what happened?

A: We went back outside and I asked Mr. Dixon if we could talk about this, if we could resolve it.

Q: Why would you go outside and get involved with Mr. Dixon after he make all these threats to you?

A: I thought—I was just—I didn't understand why he was behaving the way that he did. I thought that if we could look at the car, and we could assess the damage, that things could be resolved, and there wouldn't be anymore threats to Jacob Morgan.

\* \* \*

Q: . . . Would you tell the jury what happened?

A: I asked Mr. Dixon if we could take a look at the car. He said, we could. We met in the street. Went over to the car. He pointed out the smudge mark on the window.

\* \* \*

Q: What was said and done after that?

A: Mr. Dixon, and I, and Jacob at the vehicle, parted on what I thought were amicable terms. . . . Mr. Dixon went back towards his side of the street, in front of his home, and I went back towards the home of Mary Morgan, 509.

Q: Now, did Mr. Dixon have his dog with him at the area where the car was being viewed?

A: When we were viewing the car, the girlfriend had the dog.

*    *    *

Q: Now, where did you go after you had the little discussion at the car?

A: I went back in front of Mary Morgan's home.

*    *    *

Q: What's the next thing that happened?

A: Mr. Dixon made a statement that he had to protect himself since the Travon Martin case.

Q: Where did that come from?

A: I have no idea; and I said, what are you talking about. He said, you know, I have to watch myself because of Travon Martin.

*    *    *

Q: What happened next?

A: I said, you know, when he brought up about that, I agreed with Mr. Dixon that the case of Travon Martin in Florida was a messed up case, because Mr. George Zimmerman had been advised 13 times by police dispatch not to get out of his car, not to pursue Travon Martin. He ignored police dispatchers, took the time to place the vehicle in park, get out of the car, close the door, and then

- 11 -

pursue Mr. Travon Martin down an alley and provoke an attack, in which he was then able to use the Statute in Florida to be involved in a shooting that resulted in the death of Travon Martin.

Q: Did you explain this or attempt to explain this to Mr. Dixon?

A: Yes. I was trying to explain that to Mr. Dixon.

Q: What was Mr. Dixon's reaction as you were trying to explain this?

A: He just kept—he was getting mad, very, very aggressively mad.

* * *

Q: How far away was Mr. Dixon from you when you were arguing about the Travon Martin case?

A: We were on opposing sides of the street.

* * *

Q: Was the dog on a leash at that time or not on a leash?

A: It was on a leash until he went over and took the dog off the leash . . . .

Q: When did that occur?

A: That occurred right after he said, I'm going to come take a piece out of you, and when I'm done taking a piece out of you, I'm going to let my pit bull take a piece out of you as well.

* * *

Q: Was anybody else saying anything around that area, or was it just confined between you and Mr. Dixon?

A: Right before Mr. Dixon came across the street at me, his girlfriend said, leave him alone. He's not worth it.

\* \* \*

As he was coming at me, I was walking backwards in retreat . . . .

\* \* \*

He said, I'm going to attack you. I'm going to put your—I'm going to put your head in this bag of dog shit.

\* \* \*

He came up in front of Mary Morgan's home . . . He hit me on the side of the head . . .

\* \* \*

Q: Did you actually go back and fall to the ground?

A: I fell backwards, but I was able to catch myself with my left hand.

Q: And would you show us how that happened?

A: Stand up?

Q: Yes, please.

A: He struck me, and as I fell backwards, and I caught myself on the ground with my left hand; and when I—as soon as I did that, he was right—right in front of me, on top of me.

Q: Then what happened?

A: As I was coming back up, I drew my .25 caliber Phoenix Arms, and I pressed the trigger.

\* \* \*

Q: How many times did you press the trigger, if you know?

A: It was quick, the first volley of rounds. I thought I missed him or the gun had misfired . . . .

* * *

Q: You fired the first time, and then there was a gap of some time. . . .

A: Correct.

Q: Between that. How much time elapsed between that?

A: Just a second or two.

* * *

Q: Do you know how many times you pulled the trigger?

A: Twice.

Q: Now, this is not an automatic weapon? You've actually got to pull the trigger for each time a bullet is fired?

A: Correct.

N.T., 6/18/14, at 402, 404-08, 410-17, 419-21, 423-24.

Appellant was cross-examined by the Commonwealth, *inter alia*, as follows:

[The Commonwealth]: The question was, you felt that you needed to draw your weapon and fire it to protect yourself from this unarmed person?

A: Yes.

Q: Correct?

A: Yes.

Q: Now, as we sit here today—well, you listened to the recorded statement; and in your statement you—and on the 911 call, you were adamant that Jamal Dixon's vicious

- 14 -

pit bull was being used as a weapon against you, isn't that right?

A: Yes.

Q: Correct?

A: Yes.

Q: That you were afraid that you were going to be bitten and eaten by this pit bull, is that right?

A: Something along those lines, yes.

Q: Yes. Why didn't you shoot the dog?

A: Because the dog was in the street with the girlfriend.

Q: You said in your statement that the dog was coming after you. He came across the street. He called for his girlfriend with the dog, which was a pit bull at that time, and the dog was coming up behind him. He's coming at me. That's what you said in your statement?

A: Correct.

Q: That's not what you said today, is it?

A: I don't understand.

Q: Is it? You did not say that today, did you?

A: No.

*Id.* at 455-56

On June 19, 2014, Appellant was convicted of criminal attempt-criminal homicide[7] and aggravated assault. Appellant was sentenced to ten

---

[7] We note that the jury specifically found Appellant caused serious bodily injury. *See* N.T., 6/19/14, at 88.

to twenty years' imprisonment for criminal attempt. There was no further penalty for the aggravated assault conviction. Appellant did not file post-sentence motions. Appellant filed a timely notice of appeal. Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal and the trial court filed a responsive opinion.

Appellant raises the following issues for our review:

> I. Did the trial court impose an illegal sentence by considering the five-year mandatory minimum sentence set forth under 42 Pa.C.S. § 9721, which this Court has deemed unconstitutional in its entirety?
>
> II. Was the evidence insufficient to support a conviction for attempted homicide as the Commonwealth failed to disprove [Appellant's] self-defense claim beyond a reasonable doubt?

Appellant's Brief at 4.[8]

First, Appellant argues "[t]he trial court imposed an illegal sentence by considering the five-year mandatory minimum sentence set forth under 42 Pa.C.S. § 9712, which this court has deemed unconstitutional in its entirety." *Id.* at 25. Appellant contends the sentence was unconstitutional pursuant to

---

[8] We note that although Appellant did not file post-sentence motions, the claims raised on appeal are properly before us. *See Commonwealth v. Foster*, 17 A.3d 332, 337 (Pa. 2011) (challenge to legality of sentence nonwaivable); *Commonwealth v. Coleman*, 19 A.3d 1111, 1118 (Pa. Super. 2011) (sufficiency of evidence claim may be raised for first time on appeal); Pa.R.Crim.P. 606(A)(7).

***Alleyne*** and ***Commonwealth v. Valentine***, 101 A.3d 801 (Pa. Super. 2014), *appeal denied*, 124 A.3d 309 (Pa. 2015). ***Id.***

Our review is governed by the following principles. "Issues relating to the legality of a sentence are questions of law[.] . . . Our standard of review over such questions is *de novo* and our scope of review is plenary." ***Commonwealth v. Cardwell***, 105 A.3d 748, 750 (Pa. Super. 2014), *appeal denied*, 121 A.3d 494 (Pa. 2015) (citation omitted).

In the case *sub judice*, the trial court opined:

> [Appellant] was convicted of criminal attempt-homicide, and aggravated assault. The attempted homicide charge specifically accused [Appellant] of causing "serious bodily injury." The statutory maximum was 40 years. The guidelines suggested a sentence of 90 months to the statutory limit of 480 months in the standard range. The [c]ourt's sentence was 120 months to 240 months. So, the sentence was 30 months above the bottom rung of this guideline range. This sentence was well within the guideline range and leaning significantly toward the lower end of the range.
>
> The [c]ourt began its explanation with guidelines on purpose. The [c]ourt was influenced by its work and findings. But, more importantly, the [c]ourt began there to show that **the mandatory minimum which [Appellant] complains about did not enter the [c]ourt's thinking when it imposed this sentence**. . . .

Trial Ct. Op., 8/31/15, at 2 (footnotes omitted and emphasis added).

At sentencing, the trial court stated, *inter alia*, as follows:

> [The jury] thought that you wanted to instigate more violence, they believed that you tried to induce the victim where you could describe him as a aggressor or the violent one, but it didn't work and the jury didn't believe you and that's why we're here today and that's why I am

sentencing you to 10 to 20 years in the State Correctional Institution with 20 year probation.

N.T. Sentencing Hr'g, 9/8/14, at 32. The sentencing order provided, in pertinent part, as follows:

AND NOW, this 8th day of September, 2014, the defendant having been convicted in the above-captioned case is hereby sentenced by this [c]ourt as follows. The defendant is to pay all applicable fees and costs unless otherwise noted below:

**Count 1**-18 § 901 §§ A—Criminal Attempt—Criminal Homicide (H1)
    To be confined for a minimum period of 10 Year(s) and a maximum period 20 Year(s) at SCI Camp Hill.
    This sentence shall commence on 09/08/2014.

*    *    *

**Count 2**—18 § 2702 §§ A1—Aggravated Assault (F1)
    A determination of guilty without further penalty.

**Count 3**—18 § 2705 §§ A—Recklessly endangering Another Person (M2)
    Offense Disposition: Withdrawn.

Order, 9/8/14, at 1.

Instantly, the trial court did not consider the mandatory minimum set forth in 42 Pa.C.S. § 9712. Thus, Appellant's sentence is not illegal on that ground. *See id.*

Lastly, Appellant argues that the evidence was insufficient to support his conviction for attempted homicide because the Commonwealth did not disprove his claim that he acted in self-defense beyond a reasonable doubt. Appellant's Brief at 29. Appellant contends that he was in fear for his life

- 18 -

when he reached for his gun. *Id.* at 33. Appellant avers that "[b]ecause it did not appear that he had hit Dixon, [Appellant]—fearing that Dixon would continue the attack—fired his gun again." *Id.* at 34.

We review a sufficiency of the evidence claim as follows:

> "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to 'ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict. The Superior Court properly articulated the correct substantive standard enunciated by this Court for review of a sufficiency of the evidence claim: all of the evidence and any inferences drawn therefrom must be viewed in the light most favorable to the Commonwealth as the verdict winner.

*Commonwealth v. Ratsamy*, 934 A.2d 1233, 1235-36 (Pa. 2007) (citations omitted).

In *Commonwealth v. Torres*, 766 A.2d 342 (Pa. 2001), our Supreme Court set forth the following analysis of a claim that the evidence was insufficient to disprove a claim of self-defense:

> The use of force against a person is justified when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person. *See* 18 Pa.C.S. § 505(a).[9] When a defendant raises the issue of self-

---

[9] Section 505(a) provides:

> **(a) Use of force justifiable for protection of the person.**—The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting

- 19 -

defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt. While there is no burden on a defendant to prove the claim, before the defense is properly at issue at trial, there must be some evidence, from whatever source, to justify a finding of self-defense.

*Id.* at 345 (some citations omitted).

In order to establish self-defense in this situation where appellant used deadly force upon another, it must be shown that a) the actor was free from fault in provoking or continuing the difficulty which resulted in the use of deadly force; b) the actor must have reasonably believed that he was in imminent danger of death or serious bodily injury, and that there was a necessity to use such force in order

himself against the use of unlawful force by such other person on the present occasion.

18 Pa.C.S. § 505(a). However, pursuant to Section 505(b)(2):

(2) The use of deadly force is not justifiable under this section unless the actor **believes** that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505(b)(i)-(ii) (emphasis added). Section 501 defines the word "believes" as "reasonably believes." 18 Pa.C.S. § 501.

to save himself or others therefrom; and c) the actor did not violate any duty to retreat or to avoid the danger.

*Commonwealth v. Harris*, 665 A.2d 1172, 1174 (Pa. 1995) (citations omitted).

"It remains the province of the jury to determine whether the accused's belief was reasonable, whether he was free of provocation, and whether he had no duty to retreat." *Commonwealth v. McClendon*, 874 A.2d 1223, 1230 (Pa. Super. 2005) (citation omitted). Where there was conflicting evidence[10] presented as to the issue of whether the defendant acted in self-defense, "[t]he jury was entitled to believe the testimony of the Commonwealth's witnesses and disbelieve the testimony of" the defendant. *Commonwealth v. Reynolds*, 835 A.2d 720, 731 (Pa. Super. 2003).

In the instant case, the trial court opined:

> Let us begin with an obvious observation. [Appellant's] self-defense claim was put before a jury and they rejected it. They had the opportunity to credit [Appellant's] version of events but they choose not to.
>
> * * *
>
> The government's evidence showed [Appellant] was the aggressor and he could have avoided the situation entirely.

---

[10] We note that "[q]uestions concerning inconsistent testimony . . . go to the credibility of the witnesses. This Court cannot substitute its judgment for that of the jury on issues of credibility." *Commonwealth v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004) (citations omitted).

Jamal Dixon told the jury that after the discussion about the basketball hitting his car was going nowhere, he walked back toward his house. This separation did not stop [Appellant] from leveling obscenities at him. Dixon told [Appellant] to take the language down the street so children do not have to hear it. Dixon approached [Appellant] towards the middle of the street. He told [Appellant] to go down the street. . . . [Appellant] then pushed Dixon. Dixon told him if he put his hands on him again, Dixon was going to hit him with a bag of dog poop. [Appellant] then pulled gun from his waist. . . . [Appellant] fired his gun. Dixon dropped to the ground. He could not run. He had to crawl to a safe spot by a car. This scenario shows the government disproved [Appellant's] claim of self-defense.

Trial Ct. Op. at 5-6. We agree no relief is due.

Appellant presented a claim of self-defense, *viz*., that he was in fear for his life when Dixon pushed him. *See Torres*, 766 A.2d at 345; *Harris*, 665 A.2d at 1174. However, the Commonwealth presented overwhelming evidence rebutting the assertion of self-defense. Dixon testified that Appellant was the aggressor. Kaelin Bubonovich testified that Dixon did not attempt to hit Appellant. Mary Morgan testified that Dixon struck Appellant. *See Reynolds*, 835 A.2d at 731. The jury was entitled to believe the Commonwealth's witnesses and disbelieve Appellant. *See id.*; *McClendon*, 874 A.2d at 1230. Therefore, the evidence, viewed in the light most favorable to the Commonwealth as the prevailing party, was sufficient to disprove that Appellant acted in self- defense under Section 505. *See Ratsamy*, 934 A.2d at 1235-36. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  5/5/2016